SHANNON, Acting Chief Judge.
The Professional Golfers Association of America, a non-profit Florida corporation, appeals from an order for a temporary injunction entered on May 1, 1964, wherein the appellant and the appellee, Bankers Life and Casualty Company, an Illinois corporation, were mandatorily enjoined to continue to carry out the interim obligations delineated and not delineated which each had assumed, and whereby each was directed and enjoined to maintain the interim status quo.
Appellee’s amended complaint upon which the suit is predicated is primarily for specific performance of a written contract. Appellant filed a motion to dismiss the complaint, which motion is pending and un-disposed of. There was filed. by appellee a motion for a restraining order, and the appeal is the product of the interlocutory order entered by the court consequent upon that motion.
The subject of this litigation is a contract entered into by and between PGA, Bankers, the City of Palm Beach Gardens, and John B. MacArthur. We are advised by the appellee in its brief that the City of Palm Beach Gardens has assigned all of its interest in the contract to Bankers. The main provisions of the contract, which runs approximately 24 pages, are that there will be constructed two 18-hole golf courses and a club house, together with other related facilities, and the same shall be sold to the PGA for a base consideration of $825,-672.00. The agreement supersedes several prior agreements between the parties and, insofar as the record shows, is the only written agreement existing between the PGA and Bankers. The contract provides that upon completion, and upon approval by the PGA through its architects and its president, the transaction will be closed. The date for concluding the sale and dc- *490 livery of possession is stated as November 3, 1963, “or by the earliest possible date thereafter,” subject to certain exceptions of strikes, acts of God, etc.
The golf courses and other facilities were not completed by November 3, 1963. On December 31, 1963, MacArthur, the president of Bankers, wrote the following letter to the president of the PGA:
“December 31, 1963
“Mr. Warren Cantrell, President
“The Professional Golfers’ Association of America
“P. O. Box 670
“Dunedin, Florida
“Dear Warren,
“It has come to my attention that many members of the Professional Golfers’ Association have arrived in the Palm Beach Gardens area with the understanding that the new PGA National Golf Club would be in operation.
“As you know, the delay caused by the late arrival of some materials and some of the subcontracting work has caused an unforseen (sic) delay in concluding the construction of the Clubhouse. However, the small details all seem to be in the final stages for all work to be completed in a matter of a few days.
“In view of the above and realizing that your first Tournament is scheduled for January 15th, I would be pleased to have you use any of the golf course, clubhouse or other facilities that you care to, as guests of Bankers Life and Casualty Company, so that you can begin operations.
“Meanwhile, no effort will be spared to conclude all phases of this entire project to effect the earliest possible conclusion and transfer of ownership to The Professional Golfers’ Association of America.
“Also, it is needless to say, that nothing you do in connection with this proposed interim operation shall be construed as approval, acceptance, a release of any of the rights of the Association or in any manner a violation or breach of the Agreement dated April 24, 1963 between the Professional Golfers’ Association of America, the City of Palm Beach Gardens, Bankers Life and Casualty Company and myself, personally.
, “Trusting that this suggestion meets with your approval, that all matters will co-ordinate for an early closing, wishing you a Successful New Year and looking forward to seeing you, I am
“Sincerely yours.
“/s/ John D. MacArthur
“John D. MacArthur, Presi- >' dent
“Bankers Life and Casualty Company
“cc/ Lou Strong T. W. Crane.”
The PGA accepted this invitation, entering into occupation of the golf courses and other facilities. They held several tournaments, obtained a liquor license, advertised in the newspaper, and scheduled social events. The maintenance men for the golf courses were being paid by Bankers, and they were supervised by an employee of the PGA.
There was no supplemental agreement, either oral or written, between the parties. In April, 1964, the PGA notified Bankers that it intended to vacate the premises as of May 1, 1964, pending completion and negotiation of disputed points. At this time Bankers obtained a mandatory injunction prohibiting the PGA from vacating the premises and requiring them to maintain the status quo, no bond being required of Bankers. This injunction stated the following:
“ * * * The enforcement or the specific performance of said main contract is not before the Court; neither is the issue of whether either party has failed to properly perform under *491 said main contract. The issue before the Court is whether there are any other contractual obligations existing between the parties, and whether these obligations have been breached or threatened to be breached, and whether there would result therefrom irreparable damage.
“In that the main contract has not been completed, and, through a desire on the part of both of the parties to this action to put the said golf course and club house in operation, the parties have, by mutual agreement and understanding and by bilateral action, created contractual obligations which each has been performing during the interim, pending the completion of the main contract. The Court finds that the defendant has been in control of the club house and the golf course, and has regulated the use thereof, and fixed the fees therefor; further, the defendant has paid certain operating expenses and deposited to itself certain net receipts; further, the defendant has hired its green keeper who hires, fires and controls the grounds maintenance crew; further, the defendant pays the greens keeper, and the plaintiff pays the salary of the maintenance crew, subject to reimbursement; further, the plaintiff has made certain other payments and loans to keep the premises in operation, and both parties agree that there should be an accounting by each of the parties for the interim operation at the time of closing; further, there are other functions carried out by each of the parties through a mutual understanding and action, which are not delineated in this Order; further, there has been a threatened abandonment by the defendant as to these interim obligations and contractual relations; further, that, if such abandonment were effected, it would not only cause damage and injury to the physical plant but primarily and chiefly irreparable injury to both parties in the successful completion of the main contract. By way of dicta, it would appear that the plaintiff should make a fast and determined effort to complete plaintiff’s obligation under the main contract, and that the defendant should not unduly withhold approval thereof. However,, in consideration of the above findings* it is
“ORDERED, ADJUDGED AND DECREED that both the plaintiff, BANKERS LIFE & CASUALTY COMPANY, and the defendant, PROFESSIONAL GOLFERS ASSOCIATION OF AMERICA, shall continue to carry out the interim obligations delineated and not delineated, which each has assumed; further, each is hereby enjoined from refusing to carry out the same; further, each is hereby directed and enjoined to maintain the interim status quo. * * * ”
There appear to be two issues presented by this appeal: 1) Will there be irreparable damage caused by the PGA vacating the property pending the completion of the work? And 2) Is the PGA obligated to continue in possession and operation of the premises by virtue of their having gone into possession at the invitation of Bankers, pending completion of the contract?
There are no Florida cases in which the facts are very similar to the facts of the present case. The following statements regarding mandatory injunctions are from Florida Jurisprudence:
“17 Fla.Jur., Injunctions, Sec. 77. It has been seen that injunctive relief will not lie unless irreparable injury will otherwise result * * *. Mere general allegations of irreparable injury are not sufficient, and will not ordinarily warrant the granting of relief by injunction. The facts constituting such injury must be set up clearly so that the court may determine the exact nature and extent of the possible injury.
“17 Fla.Jur., Injunctions, Sec. 22. Irreparable injury is an injury of such *492 a nature that it cannot be redressed in a court of law. Thus, the mere diminution in the value of property, without irreparable mischief, will not in general furnish foundation for equitable relief. * H=
In his decree the chancellor found that if the PGA were permitted to vacate the premises “it would not only cause damage and injury to the physical plant but primarily and chiefly irreparable injury to both parties in the successful completion of the main contract.” If the PGA is permitted to leave, Bankers has two alternatives in regard to maintenance of the golf courses. Since the grounds crew is paid by Bankers and is supervised by a PGA employee, Bankers can hire a man to replace the one PGA employee, thus keeping the courses in their present condition. The other alternative, of course, is to discontinue maintaining the golf courses. The evidence showed that if this were done they would then have to be reconditioned in order to be put in playable condition. In either case the damages would not be irreparable.
In Thompson v. Shell Petroleum Corporation, 1938, 130 Fla. 652, 178 So. 413, 117 A.L.R. 248, the Court issued a mandatory injunction requiring a lessee to continue to possess and operate a filling station in accordance with the lease. The Court found that by allowing the lessee to break the lease there would be irreparable damage to Shell because they had gone to considerable expense in painting, putting up signs, installing equipment, etc., but in this decision the Court stated:
“We find by a review of the authorities that usually the same general rules apply to injunctions against the breach of a contract that apply to specific performance.
“ 'An injunction restraining the breach of a contract is a negative specific enforcement of that contract. The jurisdiction of equity to grant such injunction is substantially coincident with its jurisdiction to compel a specific performance. Both are governed by the same doctrines and rules; and it may be stated as a general proposition that wherever the contract is one of a class which will be affirmatively specifically enforced, a court of equity will restrain its breach by injunction, if this is the only practical mode of enforcement which its terms permit.’ ^
“ ‘The tendency of the American Courts has been to limit, rather than to enlarge, the jurisdiction in cases of contracts. English Courts will enjoin the violation of some contracts, even though they can not be specifically enforced. The American Courts with few exceptions refuse to adopt this doctrine.’ Pomeroy’s Equity Jurisprudence, 4th Ed. § 1341, Vo. 4.”
17 Fla.Jur., Injunctions, Sec. 33, states:
“It is plain that to enjoin one from doing something in violation of his contract is an indirect mode of enforcing the affirmative provisions of the contract, although such an injunction may often fall short of accomplishing its object. Hence, a suit for injunction against breach of contract is tantamount to a suit for specific performance thereof, and the same general principles control the granting of both remedies. Accordingly, the considerations determining whether a court should order specific performance to a large extent control in determining whether injunc-tive relief should be available to restrain violation of the provisions of an agreement.”
The record does not indicate any other contract besides the main contract, which, of course, hasn’t been completed. The major item which has not been finished in accordance with the terms of the contract is the irrigation system. The evidence showed that it could cost between $100,000.00 and $200,000.00 to put this system into satisfactory operating condition. *493 In addition, “half-way houses” and the parking area have not been completed. Needless to say, the PGA has not approved of the facilities as provided in the main contract, because Bankers has not performed its obligation according to the contract. We do not see how the fact that the PGA accepted the invitation of MacArthur’s letter of December 31, 1963, could change this situation. The PGA’s acceptance and subsequent action did not create contractual obligations apart from the main contract.
We find that vacation of the premises by the PGA pending completion of the contract will not cause irreparable damage. The temporary injunctive order is reversed and the cause remanded.
Reversed.
ANDREWS and KANNER, (Ret.), JJ., concur.